**David SCHMITZ, Appellant,**

v.

**YUKON–KOYUKUK SCHOOL DISTRICT, Christopher Simon, and Does 1 Through 10, Appellees.**

No. S–11683.

Supreme Court of Alaska.

Nov. 17, 2006.

---

D. Randall Ensminger, Law Offices of D. Randall Ensminger, Fairbanks, for Appellant.

Howard S. Trickey and Matthew Singer, Jermain Dunnagan & Owens, P.C., Anchorage, for Appellees.

Before: BRYNER, Chief Justice,
MATTHEWS, EASTAUGH, and
CARPENETI, Justices.

*OPINION*

BRYNER, Chief Justice.

## I. INTRODUCTION

David Schmitz negotiated a contract with the Yukon–Koyukuk School District to teach at the Coldfoot School for the 2001–2002 school year. The contract gave him tenure and provided that if the district eliminated his position he would be assigned to the district's central office in Fairbanks. Although the contract contained no grievance provisions, it incorporated the terms of the collective bargaining agreement (CBA) between the district and the teachers' union, which set out a three-step grievance process. The district terminated the Coldfoot position and transferred Schmitz to Fairbanks in January 2002; soon after, it transferred Schmitz again, to Huslia, and notified him that he would not be retained after the school year ended. Schmitz sued the district, asserting breach of contract and various other claims. The superior court dismissed these claims on summary judgment, ruling that Schmitz had failed to exhaust his administrative remedies under the CBA. We affirm, holding that the CBA's grievance procedures applied to Schmitz's contract, that Schmitz failed to exhaust his remedies as required under the CBA, and that he made no timely offer of evidence to excuse his failure to meet this requirement.

## II. FACTS AND PROCEEDINGS

David Schmitz negotiated a contract with the Yukon–Koyukuk School District to be a teacher at the Coldfoot school for the 2001–2002 school year. The contract stated that "[s]hould it become necessary to eliminate the position because of decreased enrollment ... Mr. Schmitz will be employed by the District as a Reading Specialist, operating out of the Central Office." The central office is in Fairbanks. The contract also stated that "[t]his contract creates no obligation on DISTRICT to offer continuing employment to TEACHER except as provided by Alaska Law. Mr. Schmitz is tenured on the first day of employment with Yukon Koyukuk School District because of his previous five (5) successful years of employment with Yukon Koyukuk School District."

The contract had no grievance or arbitration provisions. But it stated that "TEACHER shall abide by applicable laws, regulations, policies of the Yukon Koyukuk School District Board of Education, procedures established by DISTRICT, and terms and conditions of the Negotiated Agreement, as may be amended from time to time."

It is undisputed that the contract's term "Negotiated Agreement" referred to the collective bargaining agreement ("the CBA") between the Yukon–Koyukuk School District and the teachers' union, the Middle Yukon–National Education Association ("the Association"). The CBA prescribed a three-step grievance and arbitration process to be followed if any dispute arose under the CBA. Step I involved filing a letter with one's supervisor. Step II involved sending a letter to the district's superintendent, who was required to hold a hearing. And Step III allowed the Association to demand arbitration.

Schmitz began work at the Coldfoot school on August 16, 2001. In January 2002 the district eliminated Schmitz's position at the Coldfoot school because of decreased enrollment, and it transferred him to the central office in Fairbanks. Schmitz then agreed to teach at Jimmy Huntington School in Huslia from February 18 through March 1, 2002. Although the assignment was supposed to be temporary, on March 1 the school district's superintendent, Christopher Simon, informed Schmitz that the district needed to keep Schmitz in Huslia for the rest of the school year.

Schmitz immediately sent a letter of objection to Simon and the school board, complaining that the permanent reassignment to Huslia would force him to live 250 miles away from his wife and children, against his wishes. Schmitz also noted that he had recently suffered injuries in an accident that required him to receive therapy that was unavailable in Huslia.

On March 14 Schmitz followed up with a Step I grievance letter to his immediate supervisor, Doc Lantz, the principal of Jimmy Huntington School. In his letter, Schmitz asked to be returned to the district office in Fairbanks, alleging that his involuntary transfer violated both the CBA and his contract; he also said that he had heard that the district might not retain him for the following school year, asserting that, since he was tenured, this would violate the CBA.

On March 26 Lantz responded to Schmitz, suggesting that he deal directly with Simon. Schmitz wrote a Step II grievance letter to Simon on April 1, restating his complaints and asking Simon to set up a Step II conference.

The Step II conference was scheduled for April 11, 2002. On April 10, the day before the hearing, Simon formally notified Schmitz that the district would not retain him as a teacher the following year.

Simon held the Step II grievance hearing by teleconference on April 11, as scheduled. In a letter sent the following day, April 12, Simon denied Schmitz's Step I and Step II grievances. The letter informed Schmitz that the district viewed his reassignment to Huslia as permissible under his teaching contract because "the contract ... does not state that you cannot be transferred from the district office should the need arise." As to the tenure issue, Simon stated that Schmitz's right to claim tenure was "a right created by state law rather than by individual contract" and that, in the district's view, under AS 14.20.150(e), Schmitz would not become tenured until "the first instructional day of the third year of employment in the new school district." Simon sent a copy of the denial letter to Association President Heidi Wright, as required under the CBA.

Schmitz did not attempt to file a Step III grievance for arbitration, nor did he ask Wright to file such a grievance on his behalf. Instead, after the 2001–2002 school year ended, he simply obtained other employment.

In April 2003, one year after the Step II hearing, Schmitz filed a superior court action against the school district and Simon (collectively "the District"), claiming compensatory and punitive damages for breach of contract, misrepresentation regarding the job site and tenure, intentional infliction of emotional distress, and intentional interference with contract.

The District moved for summary judgment, asserting that Schmitz had failed to exhaust available administrative and contractual remedies by neglecting to file a Step III grievance as required under the CBA.

In response, Schmitz asserted that the CBA did not apply to his case. Because his claims arose from the District's breach of his teaching contract rather than from any alleged violation of the CBA itself, Schmitz argued, he had no duty to exhaust the CBA's grievance requirements. He did not claim that he had exhausted or tried to exhaust the CBA's grievance requirements; nor did he claim that he had made any effort to convince the Association to pursue a Step III grievance on his behalf.

The superior court rejected Schmitz's arguments and granted the District's motion for summary judgment, concluding that Schmitz had failed to exhaust his remedies under the CBA.

Schmitz moved for reconsideration, contending that the court had overlooked or misconceived "the fact that Plaintiff did request that the Association pursue a Step 3 grievance and was turned down." In a memorandum accompanying this motion, Schmitz asserted for the first time that he had actually attempted to exhaust his administrative remedies but that he had been told that the Association would not pursue his complaints. Schmitz sought to support his new claim with affidavits from himself and his attorney, D. Randall Ensminger.

In his own affidavit, Schmitz alleged that shortly after the District rejected his Step II grievance in April 2002, he called Rod Pfisterer, the UniServe Director for NEA–Alaska, and asked if the Association would file a Step III grievance on his behalf. According to Schmitz, Pfisterer responded that the Association would not be able to file the Step III grievance, "because [Schmitz's] complaints involved issues that were 'off agreement.'" Schmitz did not believe that he had

ever put this request in writing or received a written response.

Ensminger's affidavit confirmed that, sometime between March 2002 and the end of the summer of 2002, Schmitz told Ensminger that the Association had turned down his Step III grievance "because his complaints were 'off agreement.'" Ensminger noted that "it made such perfect sense that the Association had refused to file the Step 3 grievance for him because it did not involve issues covered by the negotiated agreement that I did not investigate the matter further at that time." Ensminger also said that when he was later preparing Schmitz's complaint in April 2003, he telephoned NEA–Alaska's Director, Ray Goad, to see if the Association might help with the costs of the litigation. According to Ensminger, Goad responded "that they would not be able to do so because the dispute was based on complaints that were 'off agreement.'"

Although Schmitz acknowledged that he had not disclosed this information to the court in opposing the District's motion for summary judgment, he explained that his belated offer of the evidence was "entirely ... a result of a strategic decision" by his attorney, Ensminger, who had thought that it would be best to oppose the summary judgment motion solely on the legal ground that the CBA's grievance procedures did not apply to Schmitz's claims.

Superior Court Judge Randy M. Olsen denied Schmitz's motion for reconsideration, concluding that the new evidence concerning the Association's refusal should have been disclosed before the court entered its original ruling and, alternatively, that, even if this evidence were considered, it would not raise a material issue of disputed fact concerning Schmitz's failure to meet the exhaustion requirement.

Schmitz appeals.

## III. STANDARD OF REVIEW

We review de novo an order granting summary judgment, determining whether any genuine issue of material fact exists and whether the moving party is entitled to judgment on the law applicable to the established facts.[1] We review for abuse of discretion a trial court's order denying a motion for reconsideration.[2]

## IV. DISCUSSION

### A. Superior Court's Ruling on Summary Judgment

#### 1. Applicability of exhaustion requirement

"We have repeatedly held that employees must first exhaust their contractual or administrative remedies, or show that they are excused from doing so, before they may pursue direct judicial actions against their employers."[3] Schmitz argues that because his teaching contract was entirely independent from the CBA, the CBA's grievance provisions did not cover his claim, so he had no obligation to exhaust the grievance procedures set out in the CBA. Since his teaching contract included no grievance requirements, he argues, he had no contractual or administrative remedies to exhaust.

The CBA states that "[a] 'Grievance' shall mean a written claim by a grievant that a dispute or disagreement exists involving interpretation or application *of the terms of this Agreement*." (Emphasis added.) The CBA Step III, part 1 grievance provision states:

In the event that the grievant is not satisfied with the disposition of his/her grievance at Step II, or in the event that he/she does not receive notice of its disposition within five (5) days in Step II, *and provided that the grievance concerns the meaning of this Agreement or any part or parts of it or concerns an alleged breach hereof,*

---

1. *Grant v. Anchorage Police Dep't,* 20 P.3d 553, 555 (Alaska 2001) (citing *Cozzen v. Municipality of Anchorage,* 907 P.2d 473, 475 (Alaska 1995)).

2. *Neal & Co., Inc. v. Ass'n of Village Council Presidents Reg'l Hous. Auth.,* 895 P.2d 497, 506 (Alaska 1995).

3. *State v. Beard,* 960 P.2d 1, 5 (Alaska 1998).

the Association may request arbitration within ten (10) days.

(Emphasis added.)

According to Schmitz, because this provision specifies that a grievance must "concern the meaning of this Agreement," the Step III arbitration process can be invoked only when a dispute concerns the meaning of the CBA. Since his claims concern his teaching contract rather than the CBA, he reasons, he did not have to follow CBA grievance procedures. Schmitz argues that his decision to follow Step I and Step II provisions should not prejudice his right to pursue his claims in court. In Schmitz's view, the Step I and Step II grievances merely show that he did more than he was required to do.

These arguments are unpersuasive. The teaching contract between Schmitz and the District includes no provisions for disputes arising under its provisions. But it does specify that the "TEACHER shall abide by . . . terms and conditions of the Negotiated Agreement." As the District observes, this phrase incorporates the CBA by reference, including its grievance and arbitration provisions. In light of this provision, the District reasons, the CBA and the teaching contract merge, so Schmitz was required to follow CBA grievance provisions.

■ The District's argument has merit. When a writing refers to another document, that document "becomes constructively a part of the writing, and in that respect the two form a single instrument."[4] Here, Schmitz's teaching contract referred to the CBA, or "Negotiated Agreement," expressly requiring Schmitz to "abide by . . . terms and conditions of the Negotiated Agreement." Moreover, the CBA referred to all individual teaching contracts, effectively embedding its terms in each individual contract:

> The policy set forth herein shall be included by written reference in the individual contracts of all teachers employed by the Yukon–Koyukuk School District. This Negotiated Agreement, hereafter referred to as the Agreement, shall be made part of the teacher's individual comprehensive

contract with the same force and effect as though fully set forth herein.

Given the teaching contract's and CBA's reciprocating reference provisions, the teaching contract unequivocally incorporated the terms and conditions of the CBA, and the CBA encompassed the teaching contract. Because the teaching contract had no conflicting provisions relating to grievances, it required Schmitz to abide by the CBA grievance provisions—including Step III—in asserting his claims.

### 2. Futility

■ Schmitz similarly contends that his claims fell outside the jurisdiction of the arbitration contemplated by the CBA's Step III provisions. Noting that the CBA's grievance provisions authorized arbitrators to decide only issues arising under the CBA, Schmitz insists that his claims raised questions arising under his teaching contract. Because the arbitrator would have had no authority to decide his claims, Schmitz argues, it would have been futile for him to pursue Step III arbitration under the CBA. But this argument mistakenly assumes that the teaching contract and CBA are completely independent—the same assumption we rejected in addressing Schmitz's claim that he had no duty to follow the CBA grievance process. Because the CBA and the teaching contract contained mutual incorporation provisions, Schmitz's claims did not arise exclusively under the teaching contract.

Schmitz further posits that arbitration would have been futile because the terms of the CBA created a conflict that would have precluded the arbitrator from deciding his claims. Schmitz points out that the CBA's provisions governing Step III arbitration expressly denied arbitrators the "power or authority to make any decisions which require the commission of an act prohibited by law or which is violative of the terms of this Agreement." The CBA further required arbitrators to "refer[ ] back to the parties without decision or recommendation" any case that they lacked authority to decide.

4. 11 WILLISTON ON CONTRACTS § 30:25 (4th ed.).

Because the District asserted in response to his Step II grievance that the CBA entitled it to reassign him to Huslia after his transfer to Fairbanks, Schmitz contends, an arbitrator who found that the teaching contract gave Schmitz a valid right not to be reassigned could never enforce this provision: because this contractual right would conflict with the terms of the CBA, the jurisdictional restrictions governing Step III arbitration would require the arbitrator to refer the case back to the parties. Similarly, Schmitz reasons that because the District asserted that state law precluded it from giving Schmitz tenure, it would have been futile to seek arbitration on his claim that his contract entitled him to receive tenure. In each instance, Schmitz asserts, because his contract creates a valid right that conflicts with the CBA or state law, his claims fall beyond the scope of the arbitrator's powers under the CBA.

But these arguments are flawed by the same mistaken assumption that defeated Schmitz's previous arguments: they fail to recognize that Schmitz's contract expressly incorporated the CBA, which in turn required compliance with all terms and provisions of the CBA and with all requirements imposed by state law. Because these requirements are parts of the teaching contract, it seems unlikely that the contract could properly be construed to embody any valid and enforceable promise that violated the CBA or the law. Although Schmitz insists that his claims would have required an arbitrator to enforce valid contractual provisions at odds with the CBA or the law, he fails to explain how such a conflict realistically might arise. Moreover, even if we assumed that Schmitz's claims might have resulted in this kind of conflict, the mere possibility of a conflict would not suffice to establish futility. Instead, to establish futility on the face of the CBA, Schmitz would have to show that the CBA's jurisdictional provision would necessarily preclude an arbitrator from deciding his claims on any grounds that might avoid the jurisdictional conflict—a showing Schmitz fails to make.

We thus find no merit in Schmitz's contentions that arbitration would have been futile as a matter of law.

### 3. Compliance with exhaustion requirement

█ Schmitz alternatively argues that the record demonstrates that he actually did comply with the CBA's exhaustion requirements. Specifically, Schmitz claims that undisputed evidence before the court when it ruled on summary judgment showed that he did all that he was authorized to do in pursuing his administrative remedies under the CBA. He notes that under Step III, only "the Association may request arbitration"; the CBA contains no provision authorizing or requiring an individual teacher to request Step III arbitration. Schmitz further notes that the union countersigned his Step I grievance, and it received copies of Simon's decision on Steps I and II. Because the Association had all the necessary information to decide for itself whether to pursue a Step III grievance, Schmitz claims, the CBA required him to do nothing further.

But this argument conflicts with our case law. In our past decisions addressing CBAs that required employees to pursue grievances through their unions, we have consistently ruled that a union's failure to file a grievance does not by itself establish that the CBA's remedies were exhausted. Instead, we have emphasized that employees in such cases must show that they made good faith efforts to request the union to pursue a grievance, and that they have received some form of refusal.[5]

Here, standing alone, evidence of Schmitz's compliance with Step I and Step II and the Association's subsequent failure to request arbitration was insufficient to establish exhaustion—Schmitz was required to show both that he made a good faith effort to pursue a Step III claim through the Association and that he received some form of refusal from the Association. Yet Schmitz made no such showing in response to the District's motion for summary judgment. When the superior court ruled on that motion, the only record evidence concerning the Step III

---

**5.** *See, e.g., Beard,* 960 P.2d at 5; *Casey v. City of* *Fairbanks,* 670 P.2d 1133 (Alaska 1983).

grievance was an affidavit of union representative Heidi Wright, who insisted that Schmitz had never asked her to bring a Step III grievance and that she had never declined to help Schmitz in the process. Wright further attested that she would have been "willing ... to provide assistance" to Schmitz had he requested it.

Accordingly, based on the record at the time of its ruling, the superior court correctly granted summary judgment to the District on the ground that Schmitz had failed to exhaust his remedies under the CBA.

## B. New Evidence Offered on Reconsideration

■ As already mentioned in the statement of facts, Schmitz offered new evidence addressing the exhaustion issue when he moved for reconsideration after the court granted the District's motion for summary judgment. Relying on this evidence, he argued that he had complied with the CBA's exhaustion requirements, or at least had shown that he was excused from further compliance because the Association would not have pursued a Step III grievance.

Schmitz renews these arguments on appeal. But in denying Schmitz's motion for reconsideration, the superior court found that Schmitz's new evidence was untimely, ruling that he could have filed it before the ruling on summary judgment but failed to submit it for strategic reasons. Unless the superior court abused its discretion in so finding, we must affirm its decision to deny reconsideration and refuse to consider Schmitz's appellate arguments based on this untimely evidence.[6]

In moving for reconsideration, Schmitz candidly acknowledged that his new evidence had been available earlier but that his attorney had opted to withhold it for tactical reasons. Specifically, after asserting that the superior court had overlooked a material fact, the memorandum accompanying Schmitz's motion for reconsideration explained:

Th[e] material fact is the fact that there exists a question of fact with respect to the issue of whether or not Plaintiff David Schmitz did or did not request his Association to pursue a Step 3 grievance on his behalf. The reason that the Court has overlooked or misconceived this fact is entirely as a result of a strategic decision made by undersigned counsel. This strategic decision was to not oppose the Motion for Summary Judgment on the facts, but rather to oppose the Motion based on the law. That is, Plaintiff's undersigned counsel determined that it would be best to oppose the Motion ... based on the argument that the subject matter of Plaintiff's complaints were not within the jurisdiction for a Step 3 grievance based on the express limiting language of the collective bargaining agreement[.]

In denying the motion for reconsideration, the superior court relied on this concession, concluding that Schmitz's belated efforts to submit the evidence were unjustified in light of his earlier tactical choice:

It is clear from the underlying Motion for Summary Judgment that exhaustion of administrative remedies was the central issue. Pursuant to Civil Rule 56(c) any dispute of facts needed to be set out in a "statement of genuine issues." Strategic decisions were made, and the Court cannot act on a change of strategy after the decision.

Given Schmitz's concession that his counsel had previously withheld the newly offered evidence of exhaustion for tactical reasons, the record amply supports the superior court's determination that the evidence could not properly be offered for the first time as a basis for reconsideration. The superior court did not abuse its discretion in so ruling. Although the superior court went on to deny reconsideration on an alternative ground as well—concluding that Schmitz's new evidence would not have raised a material factual dispute on the issue of futility in any event—the court's primary finding that the evidence was untimely provides an independent and adequate basis for affirming its order denying

---

6. A trial court's decision on a motion for reconsideration will not be reversed on appeal absent

an abuse of discretion. *Neal & Co., Inc.,* 895 P.2d at 506.

reconsideration, thus making it unnecessary to consider what impact the new evidence might have had if it had been timely filed.

## V. CONCLUSION

For the reasons set forth above, we AFFIRM the superior court's judgment.

FABE, Justice, not participating.